ANTON SEEFRIED, Administrator, Appellant, v. WANGLER BROTHERS COMPANY, Appellee.

MASTER AND SERVANT: Place for Work—Transitory Dangers—
1    Effect. A place for work which is otherwise reasonably safe is not rendered legally unsafe by a dangerous condition *which is extraordinary and strictly transitory.* So held in the case of an explosion.

PRINCIPLE APPLIED: A drug store was equipped with an ordinary stock. A soda fountain was located in the front of the room. Deceased was employed solely to tend said fountain, though at times he was seen to sell cigars and other small things, to put packages on the shelves, and to sweep the floor. In the rear part of the room, and some 120 feet from the soda fountain, was a prescription counter, enclosed on three sides. All compounding of ingredients was done at this counter, and was in charge of a competent registered pharmacist. Deceased never worked at this prescription counter, and had no duty to be performed thereat. This counter was easily reached from any part of the store.

The said pharmacist received an order for colored fire. It was his sole duty to compound it. He took a recognized formula, weighed out the proper amount of shellac, sulphur, and chloride of potash, properly placed the same in a mortar, and placed the pestle a foot to one side of the mortar. This was all done at the prescription counter. The deceased, at this moment of time, was at the soda fountain. Said ingredients were entirely harmless when kept separate, and the mixture, as it existed in the mortar, was equally harmless, *provided no force or friction was applied to said mixture.* A violent explosion of said mixture without a blow or friction thereon would, under the evidence, have been an extraordinary occurrence. The pharmacist knew this fact. After mixing the said ingredients, the pharmacist, with no one present but himself, turned from the mortar and mounted a nearby ladder in order to secure a fourth ingredient. When on the ladder, he was some five feet from the mortar. While on the ladder, the pharmacist heard the voice of the deceased, who said, "I am going to stir it." The pharmacist instantly said, "Bill, don't stir it," and turned to look, but before he could see the deceased, a violent explosion

occurred. When the explosion occurred, the pharmacist had been away from the mortar for about one or two minutes. Deceased was, apparently, instantly killed. He was found, frightfully mangled, near the prescription counter. One arm was blown off, and pieces of the mortar were blown into his stomach and bowels. *Held*:

1. The store, with its arrangement and condition, being a reasonably safe place, was not rendered unsafe, in a legal sense, by the transitory danger arising from mixing said ingredients.

2. Assuming the negligence of the pharmacist, yet the master had fully met his duty, and was not liable for said negligence.

3. The master was under no duty to apprehend that the deceased would intermeddle in the compounding of said ingredients, and therefore was under no duty to warn deceased of the danger attending such an act.

4. The declarations of the deceased and the attending circumstances justified the conclusion that the deceased was the one who applied the friction to the mixture.

MASTER AND SERVANT: Fellow Servants—Negligence by Competent Servants. When no danger attends the doing of a thing when it is properly done, and the master has placed the doing of such thing in the hands of a competent servant, he, the master, is not liable to another servant for the negligent manner in which the entrusted servant does said thing. So held in case of an explosion.

PRINCIPLE APPLIED: See No. 1.

MASTER AND SERVANT: Warning and Instructing Servant—Unusual and Extraordinary Dangers. A master is under no obligation to warn a servant of remote and improbable dangers, especially when such dangers do not lie in the line of the servant's employment. So held in the case of an explosion.

PRINCIPLE APPLIED: See No. 1.

EVIDENCE: Relevancy, Competency and Materiality—Assertion of Intention. The statement of a party to the effect that he is ·going to do a certain act, followed by the act's being done, or what would indicate that the act had been done as indicated, is substantive evidence of the doing of the act by the person making the declaration.

PRINCIPLE APPLIED: See No. 1.

*Appeal from Black Hawk District Court.* — GEORGE W. DUNHAM, Judge.

SATURDAY, OCTOBER 27, 1917.

ACTION to recover for personal injuries. Opinion states the facts. The court below directed a verdict for the defendant. Plaintiff appeals.—*Affirmed.*

*J. C. Murtagh* and *Mears & Lovejoy,* for appellant.

*E. H. McCoy* and *Sager, Sweet & Edwards,* for appellee.

GAYNOR, C. J.—Plaintiff is the administrator of the estate of one William Schneiderman, and brings this action to recover damages on account of his death. It is claimed that his death was due to the negligence of the defendant. Schneiderman was killed on the 1st day of December, 1913. His death was due to the explosion of a certain chemical compound while he was in the employ of the defendant.

Defendant was conducting a drug store in the city of Waterloo. The explosion occurred back of what is known as the prescription case, a place set apart for the filling of prescriptions and the compounding of medicines and other drugs. The interior of the store, at the time of the happening of the accident complained of, is as shown by the following plat:

The prescription counter shown in the plat was shut off from the rest of the store by a glass screen enclosing it on three sides, and about four feet high. This screen extended along the entire front of the prescription counter and on both ends. One could, however, pass behind the prescription case from any point back of the show cases. Access might also be had from the center of the store by passing around the rear end and turning to the right. The store was about 120 feet deep from the front windows to the rear.

Plaintiff's intestate was employed to work at the soda fountain. It appears, however, that he worked in other parts of the store as occasion required, but never behind the prescription counter. The record discloses that a few times he left his place behind the soda fountain and waited on customers at the cigar case, sold small packages, and sometimes placed drugs and medicines upon the shelves, and also swept the floor and dusted the counters. There is no affirmative evidence that this was in the line of his employment, but he was seen to do these things. He was really employed to serve at the soda fountain, and that was where his main duties were performed. Just before the fatal accident, he was so engaged, and was seen at the ice cream compartment. It appear that he commenced work about six weeks prior to the happening of the injury complained of. At the time he was hired, he was told to work at the soda fountain, and he continued to work there up to the time of his injury.

There is practically no dispute in the evidence. The facts are as follows: On the day of the accident, an order was received by one John Roberts, a registered pharmacist in the employ of the defendant, for some colored fire. The duties imposed upon Roberts, by his employment, consisted of putting up drugs and compounding prescriptions. The ingredients necessary to make this colored fire were

shellac, sulphur, and chloride of potash — one ounce of shellac, two ounces of sulphur, and six ounces of potash. Upon receipt of this order, Roberts proceeded to compound the mixture. He weighed out the different ingredients according to what seems to be a recognized formula, and placed them in a mortar. After he had them put together in the mortar, he placed the pestle on the right-hand side of the mortar, and went up a ladder, a few feet back of the prescription case, to get some other chemicals needed in the formula. "L" in the plat represents where the ladder stood. "M" represents where the mortar stood at that time. The explosion occurred while he was on the ladder. As a result of the explosion, he was injured and Schneiderman was killed. When he went up the ladder, there was no one in sight. The mortar and pestle were as indicated. The pestle was from 12 to 14 inches on the right side of the mortar. It was approximately from one to two minutes from the time he turned from the prescription case and went up the ladder until the explosion occurred. While on the ladder, he was from four to six feet from the mixture. The mortar, with the ingredients, was standing free and clear on the table. Around the prescription case and on shelves were bottles and packages containing drugs and medicines in what are termed pigeon holes. While on the ladder, he heard the deceased speak, and say, "I am going to stir it." Roberts said, "Bill, don't stir it." He turned, but before he had time to see deceased, the explosion occurred. He says the explosion occurred almost instantaneously upon his saying, "Don't stir it."

These facts are undisputed. Upon these facts the plaintiff predicates his right to recover, and says: That the defendant was negligent in that it failed to furnish Schneiderman a reasonably safe place in which to work; that the place became, and was, unsafe because used for the compounding and mixing of highly explosive and dan-

gerous compounds; that the ingredients of said compounds were of a "highly inflammable and easily explosive character" when brought in contact by mixing in one receptacle, all of which was well known to the defendant; that the contact of said ingredients rendered them highly explosive and dangerous; that the mixing of said compound in the store rendered the place highly unsafe and dangerous, and defendant thereby carelessly and unlawfully created and maintained a public, dangerous and deadly nuisance upon ·its premises, and thereby negligently exposed Schneiderman to great danger and peril; that the defendant, after mixing the said ingredients, negligently allowed the compound to remain in the store unguarded and uncared for, and at a place where the deceased was accustomed to go in the performance of his duty,—a place of easy access,—and without giving any warning to the decedent of the dangerous or explosive character of the compound; that Schneiderman was free from any negligence on his part.

We take it that plaintiff's action rests upon two charges of negligence: (1) That the place in which deceased was required to work was unsafe by reason of the use to which it was put; that the using of the place in which the deceased was required to work for the compounding of explosives was a breach of the duty which the defendant owed to the deceased, and, injury resulting therefrom, such breach of duty was actionable; (2) that, conceding that the place was not rendered dangerous by reason of the use to which it was put, yet, when defendant undertook to compound this dangerous explosive on the premises, it became its duty to exercise great care to protect those in the building from injury from its presence, and that it failed in this duty, and negligently left the compound unguarded and uncared for at a place where the deceased was accustomed to go in the performance of his duty.

At the conclusion of all the evidence, the court instructed the jury to return a verdict for the defendant. The jury returned a verdict for the defendant, and upon the verdict so returned, the court entered judgment for the defendant, dismissing plaintiff's petition. From this, plaintiff appeals.

The only error assigned is that the court erred in sustaining defendant's motion for a directed verdict, and in entering judgment against the plaintiff for costs.

1. MASTER AND SERVANT: place for work: transitory dangers: effect.

The first point relied upon for reversal is that it was the duty of the defendant to furnish deceased a reasonably safe place to work, and that it failed to do this, and that this failure was the proximate cause of the injury. That this duty rested upon the defendant cannot be disputed. The general rule so often stated is that it is the duty of the master to exercise reasonable care to see that his employees have a reasonably safe place assigned them in which to discharge the duties imposed upon · them by their employment, and when it is made to appear that a failure to discharge this duty was the proximate cause of an injury, the master is liable. The question here is, Did defendant exercise reasonable care in attempting to discharge this legal duty, and did it furnish the deceased a reasonably safe place in which to work, or did it fail in the discharge of this duty to the deceased? Is there any basis in the evidence, any theory of the evidence, upon which a jury, acting within the scope of its duties, could, under the law, say that the defendant failed in this respect in the full discharge of its legal duty to the deceased, before and at the time of the injury?

This resolved itself into a law question. The facts are not in dispute.

The defendant was running an ordinary drug store, with all the incidents which attach to modern drug stores,

—ice cream, soda fountain, cigars, perfumes, patent medicines, and such other articles as are found in all well regulated drug stores. The compounding of medicines and filling of prescriptions incident to the business were in the hands of a competent registered pharmacist. He testifies, and his testimony is not disputed, that, shortly before the explosion happened, he received an order for colored fire of some kind; that the order was handed to him personally; that it was for someone out of town; that the order did not prescribe the ingredients; that he had a recognized formula for mixing the compound; that he had the formula before him when he mixed the compound; that the ingredients in the compound were shellac, sulphur, and chloride of potash—one ounce of shellac, two ounces of sulphur, and six ounces of chloride of potash; that the amount of the compound represented 1½ pounds of mixture; that the order called for 1½ pounds of each of the three different fires, making 4½ pounds, all told. He testified:

"The first thing I did in mixing this compound was to weigh out the shellac according to the formula, place it in a mortar and triturate it to a fairly fine powder; that is, I ground it up with a pestle; then I placed the pestle on the right-hand side of the mortar about a foot, and weighed out the sulphur according to the formula, and placed it in the mortar. The sulphur needed no pulverizing. I put the sulphur on top of the shellac in the mortar; then I weighed out the chloride of potassium and placed it in the mortar. This did not require any powdering. After getting all three ingredients in the mortar, I went up the ladder a few feet back of the prescription case to get one of the other chemicals needed in the formula."

Professor Bond, called on behalf of the plaintiff, testified:

"I am professor of chemistry in the State Teachers' College at Cedar Falls. Before that was instructor at Ar-

mour's Institute in Chicago for three years; for a short time instructor in chemistry in the State University of Iowa; am familiar with the ingredients used in this particular compound."

He was asked this question:

"Suppose that one ounce of shellac ground up to a powder and put into a mortar, and on top of this shellac should be poured two ounces of sulphur, and upon the two ounces of sulphur should be poured six ounces of potassium chloride, would or would not the explosion of that substance in the mortar be violent or not?"

He answered:

"It would be violent.  Q. What would be the most effective agency for producing an explosion if this substance were poured together in the way I have described?  A.  I suppose a blow or friction.  The use of the hammer furnishes the blow, the friction, or both, necessary to set it off.  In case you set fire to this mixture, it burns more quietly.  There is not the explosion that comes from a blow or strike.  These ingredients are commonly used in tableau lights.  If a violent explosion resulted from a mixture of that kind, I would assume that violence or friction had been applied to it in some degree.  The mere fact of an explosion would indicate that force or friction had been applied.  The mere presence together of these constituents does not produce an explosion.  Until disturbed by force or friction, they would remain harmless.  I would not expect an explosion merely from these chemicals, in these proportions, standing in an open vessel.  It would be an extraordinary occurrence.  There would be a remote possibility of an explosion.  These constituents taken by themselves are not explosive.  They could not be exploded separately.  There is a possibility of an explosion without the application of force or friction, but it is very remote.  It has been

known to explode by mere spontaneous combustion, but that would not be this type of explosion unless the material was confined. It would ignite and burn more slowly."

Professor Getchell, called by the defendant, testified:

"I have been employed at the Iowa State Teachers' College for six years as professor of chemistry; am a graduate of the Iowa State Teachers' College and University of Wisconsin; have occasion to use sulphur and chloride of potassium. The ingredients of this compound by themselves are not explosive. If these ingredients were in a mortar, an explosion would be caused by external force, namely, friction or a sudden blow. The amount of friction used would not have to be pronounced. Rather slight friction would produce an explosion, but the friction would have to be between two hard substances. The application of friction to a substance of this character may be by different methods. Just a blow would produce friction which might cause the explosion, or it might be done by scraping between hard surfaces, something like the scratching of a match, if it was of sufficient force."

This is all the evidence on this branch of the case.

It is apparent that the defendant violated no duty owed to the deceased, in keeping these ingredients in the store in which deceased was required to work. These ingredients, in and of themselves, were harmless. The danger, if any, arose from compounding them or mixing them together. There is no evidence that there was any negligence in the manner of mixing, or in the method used. They were placed in an open mortar, and would not explode except on the application of friction or a blow from without. The mere presence together in an open mortar would not produce an explosion. Until disturbed by force or friction, they would remain harmless. The mixing was done by one skilled in the art of mixing.

When Roberts left it on the prescription table and went

up the ladder, the mixture remained a harmless compound, and would not explode under any circumstances unless friction was applied from without. Professor Bond says:

"I would not expect an explosion from these chemicals, in these proportions, standing in an open vessel. It would be an extraordinary occurrence. There would be a remote possibility of an explosion. The mere fact of an explosion would indicate that force or friction had been applied."

At the time Roberts left the compound to go up the ladder, there was no one behind the prescription case. Even an experienced chemist would not expect an explosion from these chemicals standing in an open vessel upon the table. An explosion would be an extraordinary occurrence. To produce an explosion, there must be force applied from without. Did the presence of this compound on the table, under those circumstances, violate the duty which the defendant owed to the deceased to furnish him a reasonably safe place in which to work? There are few places to be occupied in the world that are not attended with some danger. The dangers to be guarded against are those which are reasonably to be anticipated as a natural and proximate result of the conditions permitted. There is no evidence in this record that explosions such as here complained of had, prior to this time, occurred in this drug store or any other drug store from the mixing of this compound, or that an explosion ever occurred while the compound remained in an open mortar, without the application of force from without. Under this record, in no sense could the store in which the deceased was working be said to be an unsafe place, except, if at all, during the time this compound was in an open mortar behind the prescription counter. It remained there but a short time, while Roberts turned to secure from the shelf above him an added ingredient for the compound. There is absolutely nothing in this record on which to base a claim that the place was unsafe, except while this compound stood

upon this table for one or two minutes. The undisputed evidence shows that, as it stood there undisturbed, it was perfectly harmless, and would not explode except by the application of friction from without. There is no evidence that the explosion occurred through any fault of Roberts in the handling or in the mixing. Further, the danger from an explosion, if any danger there was, was purely transitory. Roberts understood and knew the necessity of avoiding friction in the making of this compound. Except for the transient hazard of the presence of this compound for this short time, a hazard from which no injury could come except by the interposition of force or friction to the substance from without, there was nothing to suggest danger to anyone from its presence. A different condition would arise had the evidence disclosed any basis for reasonable apprehension that friction might be applied to this substance in the condition and at the place it then occupied, or if the explosion had resulted from incompetency on the part of the one intrusted with its handling. We cannot say that the mixing of this compound in the store, at the time and under the circumstances, rendered the place, as a matter of law or fact, unsafe, so as to say therefrom that the defendant failed in its duty, in not furnishing deceased a reasonably safe place in which to perform his work.

The liability of the master for a failure 2. MASTER AND SERVANT: fellow servants: negligence by competent servants. to furnish a reasonably safe place to work exists only as to those dangers which inhere in the place, and are known to the master, or which the master, by the exercise of reasonable care, should have known, and are distinguished from those dangers which arise in a place as a result of the manner in which the servant of the master performs the duties assigned him. Where the thing to be done is in the hands of a competent servant, skilled in the doing of the thing, and it is apparent that no danger arises from the do-

ing when properly done, the master is not liable to another servant for the injury that results from the careless doing of it by the servant intrusted. Where the doing of the thing is attended with danger, and a skillful servant is placed in charge of the doing, and injury results from causes not inhering in the act itself, but in the manner of performing the act, the master is not liable to the servant as for a failure to perform masterial duty. To hold otherwise is to abandon the fellow-servant rule. A different rule arises where danger inheres in the doing of the act, and an incompetent servant is charged with the doing. In the latter case, the liability of the master is not found in the negligent doing by the servant, but in his own negligence in placing in charge of a dangerous instrumentality an ignorant and incompetent servant. As bearing upon this question, see *Wolters v. Summerfield Company*, 160 Iowa 127; *Galloway v. Turner Improvement Co.*, 148 Iowa 93; *Hendrickson v. United States Gypsum Co.*, 133 Iowa 89; *Meehan v. Spiers Mfg. Co.*, (Mass.) 52 N. E. 518; *Johnson v. Jackson*, (Mich.) 133 N. W. 945; *Chicago & E. R. Co. v. Dinius*, (Ind.) 84 N. E. 9. These cases lay down the doctrine that the master is required to anticipate and foresee or guard against what usually happens, or is likely to happen, but is not required to anticipate or foresee and guard against that which is unusual and not likely to happen, that which is only remote and slightly probable. The test is not whether the injurious result or consequence was possible, but whether it was probable; that is, likely to occur according to the usual experience of persons, and it is said that the fact of injury and the possibility of guarding against it do not necessarily make out a case of culpable negligence. Very few acts in life are done with such care to prevent accident as would have been possible, and the law only requires of anyone that degree of care and prudence which persons who are reasonably careful ordinarily ob-

serve. *Paul v. Consolidated Fireworks Company,* (N. Y.), 105 N. E. 795; *Whittaker v. Bent,* (Mass.) 46 N. E. 121.

Under this record, it is clear that the cause of the explosion was one which the defendant could not have anticipated. When Roberts left the compound in the mortar and turned to the ladder, deceased was at the soda fountain.

3. MASTER AND SERVANT: warning and instructing servant: unusual and extraordinary dangers.

This brings us to the second question: Was Roberts negligent in leaving this compound exposed on the table and turning as he did to the ladder for the space of time shown in this record, assuming, for the purpose of this case, that his act was the act of the defendant? The compound was harmless unless friction was applied. Is there any basis shown in this record for holding that the master should have anticipated that another of the employes would come to this point during that short interval and apply friction to it? Was there negligence in failing to warn the other employes of the fact that the compound was there subject to explosion upon friction? The general rule is that the master is not required to anticipate and warn against every possible danger to which a servant may be exposed in the course of his employment. Generally, it is the duty of the master to instruct the servant as to the nature of the risks and dangers to be apprehended in the course of his employment. He is not required to warn against special dangers which spring out of particular conditions which in detail cannot be foreseen. Was there danger present at the time Roberts turned to the ladder, the existence of which should have been made known to deceased, and against which he should have been warned? A master is not required to warn against danger in which he has no reason to anticipate that the servant can be involved, and certainly not when the danger is not in

the line of the employment of the servant. This is true where the danger does not inhere in the work when properly done, and is traceable only to the manner of the doing. When the thing or condition permitted to exist in and of itself does not render the place unsafe, and injury can result only from the interposition of an outside independent agency, and the interposition is such that the master could not foresee and guard against it by the exercise of reasonable care, the master is not responsible for results that follow such interposition.

In the instant case, the defendant had placed a competent and skilled person in the preparation of this compound. The compound, in and of itself, when handled by a skilled person, was attended with no danger. The compound was being prepared in a part of the store set apart for that purpose. It was in process of preparation at the time the explosion occurred. The work of preparing was yet unfinished. While it was in process of preparation, and without sufficient notice to the person in charge of the compound, deceased came from his place of duty from a distant part of the store, and, ignorant of the danger and unskilled in the work, voluntarily assumed to aid in its prosecution, and applied the friction or blow which caused the explosion. It would be outside the rule of reason to say that the defendant should have anticipated and foreseen that, in the preparation of this compound, this young man, whose duty was in a distant part of the store and in no way related to the work behind the prescription case, should come, and, without warning, do the thing which alone would produce the results of which complaint is made in this suit. To anticipate such a consequence would be outside the experience of men, and would place a burden upon an employer of skilled labor greater than he could carry. Under the record in this case, no jury could in reason say

that the place was unsafe, or that the act of leaving this compound unguarded for the space of time shown in this record constituted actionable negligence.

In this discussion, we have assumed the fact combated by appellant in his argument, to wit, that deceased applied the friction or the blow which caused the explosion. Does the record justify us in so doing? When Roberts commenced the preparation of this compound, deceased was observed to be at the soda fountain. We assume that this was when Roberts commenced the preparation of this compound. The record justifies this assumption. After he had these ingredients together, he turned to get another essential to the compound. While Roberts was on the ladder, deceased was heard to say, "I am going to stir it." Almost instantaneously upon this declaration an explosion occurred. The explosion could have been produced only by friction or a blow. After the explosion, deceased was found at the place where the explosion occurred, away from the place assigned him for his work, and the character of his injuries leaves no doubt that he was in close proximity to the compound at the time of the explosion. Pieces of the mortar were driven into his body, into his stomach and bowels. One arm was blown off, and he was frightfully mangled and injured. That he came to the place where the compound was being prepared, cannot be questioned. That he was very close to where the compound was at the time of the explosion, the character of his injuries makes manifest. Immediately before the explosion, he declared his purpose to stir this compound. This declaration indicated a purpose in his mind to do the thing which the evidence shows would produce the explosion. Having declared the purpose to do the thing, it must be assumed that that purpose existed in his mind, nothing to

4. EVIDENCE: relevancy, competency and materiality: assertion of intention.

the contrary appearing. When purposes are formed in the mind which require bodily action to make the purpose effectual, it must be assumed that the body obeyed the direction and purpose of the mind, and did the thing which the declaration indicated a purpose to do. The mind directs and controls the body. All voluntary action reflects and is the manifestation of the mental condition or purpose formed in the mind. Of course, this is not always true, but in the absence of any showing to the contrary, it must be assumed that there existed in the mind a purpose to do the thing declared, an intention to do the thing declared to be the purpose to do. In the instant case, the explosion following instantaneously upon the declaration of the deceased of a purpose to do that which, being done, would produce the explosion, it must be assumed, the contrary not appearing, that he did the thing which he declared his purpose to do, the doing of which would cause the explosion.

There is no evidence of the interposition of any independent producing cause of this explosion, except that which deceased declared it to be his purpose to interpose. When the evidence shows a recognized, rational cause for conditions shown to exist, the mind settles on that at once as a producing cause, and does not speculate as to other causes not shown to exist, even though in speculation the mind is able to grasp the possibility of other producing causes not shown in the record to be present at the time. The record discloses that the doing of the thing which the deceased declared it his purpose to do, would produce the explosion. The record shows that, immediately upon his declaring his purpose to do this thing, the explosion followed. The record of his injuries shows that he was present and in a position to do the thing he declared it his purpose to do. There is no rational conclusion to be reached from this record other than that the deceased did exactly what he declared to be his purpose to do, and that

the execution of his purpose followed the declaration and caused the explosion. There is no other cause shown for the explosion, and the finding of any other cause than the act of the deceased would have no support in the evidence. Upon this question, see *State v. Beeson,* 155 Iowa 355; *In re Mahin,* 161 Iowa 459; *Larsen v. Telegraph Cable Co.,* 150 Iowa 748; *Lake Shore & M. S. R. Co. v. Herrick,* (Ohio) 29 N. E. 1052; *Rogers v. Manhattan Life Ins. Co.,* (Cal.) 71 Pac. 348.

On the whole record, we think the court did not err in sustaining defendant's motion for a directed verdict, and the cause is therefore—*Affirmed.*

LADD, EVANS and SALINGER, JJ., concur.